# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ZERO FRICTION LLC, an Illinois limited liability company, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    20 C 70 |
| | ) |
| BALI LEATHERS, INC., a New York corporation, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Bali Leathers, Inc.'s ("Bali") Motion for Summary Judgment under Federal Rule of Civil Procedure 56. For the following reasons, the motion is granted-in-part and denied-in-part.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.[1]

---

[1] As a preliminary matter, Bali repeatedly violates Local Rule 56.1 by directly citing raw record material in its briefs—a practice long and repeatedly denounced in this district. *See Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp. 3d 715, 719–720 (N.D. Ill. 2014) (collecting cases). The Court is well within its discretion to deny summary judgment to Bali solely on this ground, although we will not do so now. *See Gray v. Carter*, 2015 WL 1502380, at *7–8 (N.D. Ill. 2015) (collecting cases). Additionally, both parties' Local

Defendant Bali manufactures and distributes one-size golf gloves. At all times relevant to this action, John Widdemer was President of Bali.

Plaintiff Zero Friction LLC ("Zero Friction") [2] makes and sells a variety of golf products, including one-size gloves, which it sells to sporting goods retailers. John Iacono is the President and Owner of Zero Friction.

In approximately 2013 or 2014, Iacono and Widdemer discussed the possibility of Bali producing one-size gloves for Zero Friction. Iacono also traveled to Johnstown, New York to visit Bali's warehouse and offices. During this visit, Iacono met with Widdemer and they discussed the Zero Fiction glove ("ZF glove") and its features, including gussets and patterns needed to make the gloves. Iacono "pointed out all the features to the glove and what makes the glove work the way it does." Dkt. # 101, ¶ 4.

The parties admit they never signed a formal confidentiality agreement during these meetings or at any point during their business relationship. However, Iacono testified that he and Widdemer discussed keeping matters confidential, and he fully believed Bali would maintain confidentiality.

---

Rule 56.1 statements suffer from violations of the rule and other issues which significantly hampered review and adjudication of Bali's motion. For example, Bali frequently cited to an entire range of exhibits, without pinpoint citations. Zero Friction often referred to bates numbers rather than the page numbers. This Court may and should strictly enforce Local Rule 56.1 and does so here. Facts not properly presented under the rule will be disregarded. *See Cichon v. Exelon Generation Co.,* 401 F.3d 803, 809 (7th Cir. 2005) ("We have . . . repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1.").

[2] Zero Friction previously operated under the name Excel Golf Products ("Excel Golf"). For purposes of clarity, references to Excel Golf in the various exhibits will be replaced with "Zero Friction."

2

Beginning in February 2014, and continuing through December 2016, the parties had a business agreement where Bali made the ZF gloves, which Zero Friction then resold to Dick's Sporting Goods ("Dick's") and other retailers. The purchase orders Zero Friction issued to Bali for the ZF gloves included the following terms:

> By acceptance of this purchase order, [Bali] acknowledges that [Zero Friction] has a proprietary interest in the Customer's business relationship and [Bali] further agrees that it will not contact, solicit, sell, or contract directly or indirectly with Customer **pertaining to the products described in this purchase order**. Any breach of the terms of this agreement by [Bali] may be enjoined and [Bali] shall also pay to [Zero Friction] all damages. . . .

Dkt. # 112-6, ¶ 3 (emphasis added). The terms of the purchase orders were not negotiated, and Bali never raised any objection to the terms. The parties dispute whether the term "products", as used in the terms of the purchase orders, means one-size gloves, or the specific one-size ZF gloves being purchased.

In August 2014, Zero Friction sent multiple requests to Bali to enter into a supplier agreement, which it has executed with other suppliers. The supplier agreement contained confidentiality, non-solicitation, and non-competition provisions. Despite Zero Friction's repeated requests to do so, Bali did not execute the supplier agreement with Zero Friction.

In or around November 2014, representatives from Bali and Dick's began emailing back and forth about a potential business relationship.[3] In these emails, Bali

---

[3] It is unclear from the cited exhibit if Bali approached Dick's or Dick's reached out to Bali. The subject of the email chain is "New Contacts", but the initial email in the chain was sent by Dick's. *See* Dkt. # 104-

provided Dick's with information about the gloves it supplied and its capabilities for sales and inventory. In emails dated around March 2015, Dick's and Bali began to discuss new product ideas and developments for gloves. Specifically, Widdemer wrote to Dick's on March 23, 2015, noting that Bali could develop one-size gloves using a new synthetic available in multiple different colors. Widdemer and Dick's representatives also went back and forth via email about materials and glove products "similar to Zero Frication [sic]." Dkt. # 93-13, at 2–3.

By August 5, 2016, Dick's and Bali came to a tentative agreement on a purchase order for Bali to produce gloves (the "Maxfli gloves") for Dick's for their 2017 stock. Around this time in 2016, Dick's officially began placing purchase orders with Bali for the Maxfli gloves, as well as other products. Bali sold the Maxfli gloves to Dick's until about September 2021.

On August 2, 2016, Dick's notified Zero Friction of an issue regarding duplicate cartons in a recent shipment of the ZF gloves. On August 11, 2016, Iacono emailed Dick's and explained Zero Friction was not at fault for the duplicate carton issue. Matthew Sharick of Dick's responded to Iacono and stated he understood that the duplication was not the fault of Zero Friction. However, Sharick also expressed concern over the demand for the Zero Friction gloves because they were "fully in-stock" for two

---

7, at 5–6. The email from Bali in response to the initial email does state, "As always, please keep us in mind for any potential glove requirements. We sincerely appreciate the opportunities." *Id.*

4

months. Sharick stated Dick's could "no longer support the line" of ZF gloves.[4] Iacono testified that Dick's later followed up by phone call and said it would be pausing orders with Zero Friction for a period of time.

Approximately one month after Dick's informed Zero Friction that it was pausing its orders for the ZF gloves, in September 2016, Iacono purchased a Maxfli glove from a Dick's store. Upon examining the Maxfli glove and taking it apart, Iacono found marked similarities between the Maxfli glove and the ZF glove. More specifically, Iacono found that the design patterns, gussets, cuts, elasticity palm patch, and colors were all the same. So, in the fall of 2016, Iacono flew out to meet with Dick's and showed a Dick's representative the Maxfli glove. Zero Friction denies that it had knowledge that Bali was the manufacturer of the Maxfli glove at this time, or at any time prior to 2019.

On July 27, 2016, a Zero Friction representative notified Iacono by email that the gloves it received from Bali and provided to Dick's were peeling. Iacono then notified Widdemer of the peeling issue, and they discussed potential solutions by email over the next few days. Later, on March 9, 2017, Iacono notified Widdemer of the peeling issue which occurred in another Zero Friction shipment and told him it "[l]ooks like your glove." Dkt. # 104-11, at 2. On March 10, 2017, Widdemer notified Bali's international manufacturer of the issue and expressed concern for the issue "because [Bali] could lose the whole Dick's program if many failures occurred." *Id.*

---

[4] The admissibility of these emails is addressed *infra*, at 18–19.

On January 8, 2019, counsel for Dick's sent a letter to Widdemer informing Bali that Dick's received a letter from Zero Friction claiming Dick's infringed on its intellectual property.

Based on these events, Zero Friction filed a complaint against Bali on January 3, 2020, alleging claims for breach of contract, unjust enrichment, and tortious interference with prospective economic advantage. Dkt. # 1. In its First Amended Complaint ("FAC"), filed on February 8, 2021, Zero Friction added claims for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 4065/1 *et seq*. Dkt. # 39. On May 17, 2021, Zero Friction filed a Second Amended Complaint ("SAC"), alleging claims for breach of contract, unjust enrichment, tortious interference, and misappropriation of trade secrets under the DTSA and the ITSA. Dkt. # 57. Bali now moves for summary judgment on the claims in the SAC.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Majors v. Gen. Elec. Co.*, 714 F.3d 527,

6

532 (7th Cir. 2013) (citation omitted).  But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture."  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment.  *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).  To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (cleaned up).  The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  And the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law.  The party opposing the motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific

7

references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(1), (3).

"A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## **DISCUSSION**

Bali moves for summary judgment on all claims. We address each claim in turn.

### A.     **Misappropriation of Trade Secrets (DTSA Claim)**

Bali first argues Zero Friction's DTSA claim is time-barred. We agree. DTSA provides for a three-year statute of limitations, beginning when the plaintiff discovers,

or by the exercise of reasonable diligence should have discovered, the alleged misappropriation. 18 U.S.C. § 1836(d). Further, "a continuing misappropriation constitutes a single claim of misappropriation." *Id.* The parties offer competing interpretations of how to determine when the clock began to run in this case. Bali argues that Zero Friction knew of its trade secrets claim as early as September 2016, when Iacono purchased the Maxfli glove from Dick's. Bali also claims that even if Zero Friction did not have actual knowledge of its trade secrets claim in 2016, it should have, through the exercise of reasonable diligence, known of its claim by that time. Zero Friction, on the other hand, claims it did not know who manufactured the Maxfli glove until February 2019, when Bali's counsel sent a letter to Zero Friction's counsel in response to a letter from counsel for Dick's.

Zero Friction claims that Bali's "extensive use of Zero Friction's confidential information in its work to develop competing gloves for Dick's was not definitively known until discovery in this action," Dkt. # 100, at 15, when Bali produced emails showing Bali had disclosed to Dick's certain 2016 discussions between Bali and Zero Friction. Zero Friction further argues that even if Zero Friction *was* suspicious of Bali in 2016, as a matter of law that suspicion would not be sufficient to start the running of the statute of limitations. *See id.* (citing *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 495 F. Supp. 3d 687, 700 (N.D. Ill. 2020) ("concerns and suspicions . . . do not start the clock on the statute of limitations" for trade secrets claims).

Even drawing all reasonable inferences in Zero Friction's favor, the record reveals much more than mere concerns or suspicions of misappropriation in 2016. Iacono purchased the offending Maxfli glove in September 2016 and took it apart. Iacono testified that he found that the design patterns, gussets, cuts, elasticity palm patch, and colors were all the same. Such purported similarities would prompt any reasonable businessman to investigate further. And, the fact that Zero Friction's counsel sent a letter directly to Dick's in 2019 "in an effort to resolve this matter," Dkt. # 100, at 6–7, also evidences knowledge of a potential claim far sooner than Zero Friction alleges.

Furthermore, Zero Friction's arguments that its DTSA claim is not time-barred because it did not know *Bali* was the wrongdoer ring hollow. The statute of limitations began to run once Zero Friction discovered, or through the exercise of reasonable diligence should have discovered, it was wrongfully injured. "[W]hen a statute of limitations does not begin to run until 'discovery,' the discovery referred to is merely discovery that the plaintiff has been wrongfully injured. He doesn't have to know who injured him. He has the limitations period to discover that, draft his complaint, and file suit." *Fid. Nat. Title Ins. Co. of New York v. Howard Sav. Bank*, 436 F.3d 836, 839 (7th Cir. 2006). Again, when asked how he knew that Zero Friction's technology was taken, Iacono said that it was because the (at the time) unknown manufacturer of the Maxfli glove made the same glove for Dick's that it made for Zero Friction, and that he knew this was the case because he took the Maxfli glove apart. Zero Friction knew it was

wronged upon examination of the Maxfli glove. Once it had this knowledge, the burden was on Zero Friction to identify the offending party and inquire as to the existence of a cause of action.

Zero Friction balks at Bali's argument that Zero Friction's failure to question its own suppliers about the Maxfli glove evidences a lack of diligence on its part. Zero Friction claims that it exercised diligence in immediately pursuing the issue with Dick's, and because it was still working with Bali and knew Bali was subject to the purchase orders' non-circumvention provision, it trusted Bali to abide by its terms. Zero Friction says Bali cites no evidence "for the proposition that Zero Friction had to jeopardize its relationships with its suppliers in order to show diligence." Dkt. # 100, at 16. This argument is a nonstarter.

Zero Friction has not come forth with any evidence from which a reasonable jury could conclude that Zero Friction did not know, and reasonably should not have known, of its claim of alleged misappropriation after Iacono examined the Maxfli glove in 2016. Iacono testified that he showed a Dick's representative the Maxfli glove. He could have asked Dick's who manufactured the Maxfli glove right then and there. There is no evidence that Iacono did so, and there is no evidence that Dick's concealed Bali's involvement with the Maxfli glove.

Bali's motion for summary judgment is granted as to Zero Friction's DTSA claim.

### B. Misappropriation of Trade Secrets (ITSA Claim)

Bali argues Zero Friction's ITSA claim must be dismissed because none of the alleged misappropriation occurred in Illinois, and the ITSA does not have extraterritorial effect.

While Zero Friction points out that one court in this District has concluded that the "ITSA not only lacks a geographic limitation, it authorizes broad geographic application for purposes of trade secret protection that would be invalid in other contexts," *Miller UK Ltd. v. Caterpillar Inc.*, 2017 WL 1196963, at *7 (N.D. Ill. 2017), others have concluded the opposite, *see Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 436 F. Supp. 3d 1150, 1168–70 (N.D. Ill. 2020); *Inventus Power, Inc. v. Shenzhen Ace Battery Co., Ltd.*, 2020 WL 3960451, at *8 (N.D. Ill. 2020); *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2021 WL 9276577, at *1 n.1 (D. Del. 2021) ("We also depart from . . . *Miller UK Ltd.* and agree with . . . *Motorola Solutions, Inc.* The Act does not apply extraterritorially.")

In *Motorola*, the court explained that under Illinois principles of statutory interpretation, which apply to the interpretation of the ITSA, "when a statute . . . is silent as to extraterritorial effect, there is a presumption that it has none." 436 F. Supp. 3d at 1168. This Court agrees with *Motorola* that it does not clearly appear from the language of the ITSA that the statute is intended to have extraterritorial reach, and therefore it is proper to apply the presumption that it does not. *See id*. at 1168–70.

12

Even if the ITSA does not apply extraterritorially, Zero Friction could potentially pursue an ITSA claim if doing so would not "in fact require extraterritorial application of the statute." *Inventus Power*, 2020 WL 3960451, at *8 (quoting *Armada (Singapore) Pte Ltd. v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 757 (N.D. Ill. 2017)). "To determine whether a particular claim requires a statute to be applied extraterritorially, Illinois courts consider whether the circumstances relevant to the claim are alleged to have occurred 'primarily and substantially' in Illinois." *Id*. (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 187 (2005)).

Zero Friction halfheartedly argues that substantial acts relating to its ITSA claims took place in Illinois, pointing out that Zero Friction is located in Illinois, Bali used Zero Friction's designs and other trade secrets which were developed in Illinois, Zero Friction conducted business with Bali for years from Illinois, and telephone calls included discussion of Zero Friction's trade secrets. Zero Friction does not support its claim with any pertinent legal authority, nor does it attempt to distinguish Bali's supporting case law. Accordingly, the Court deems the argument waived. *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). Bali's motion for summary judgment is granted as to Zero Friction's ITSA claim.

### C.     Breach of Contract

Next, the crux of the parties' contract dispute is the meaning of certain language included in a series of purchase orders issued by Zero Friction to Bali.  Specifically, the terms of purchase provide that:

> Vendor acknowledges that [Zero Friction] has a proprietary interest in the Customer's business relationship and Vendor further agrees that it will not contact, solicit, sell, or contract directly or indirectly with Customer **pertaining to the products described in this purchase order**.

Dkt. # 92-21 (emphasis added). The purchase orders do not define "Vendor" or "Customer", but the parties agree that "Vendor" refers to Bali and "Customer" refers to Dick's.

At the motion to dismiss stage, Judge Norgle concluded that the contract was ambiguous, specifically with respect to the above provision.  Dkt. # 79, at 6–8.  Judge Norgle found that it was unclear whether "pertaining to", as used in the purchase order, meant "with respect to" the described products or "in any way related to" the described products.  *Id.* at 6–7.

If "pertaining to" meant "with respect to," the purchase order would not prohibit Bali from selling any competing products to Dick's other than the exact items listed in the purchase order, and the anti-competitive effect would be limited to each individual transaction between Bali and Zero Friction.  *Id.* at 7.  On the other hand, if "pertaining to" meant "in any way related to," the purchase order could plausibly prohibit the sale of limited competing products, especially if they were virtually identical to the products

listed in the purchase order. *Id.* Further information concerning the parties' intentions was required to determine the meaning of the phrase. Additionally, the phrase "products described in this purchase order" required more information.

Bali contends discovery has resolved the ambiguity. Pointing to Zero Friction's proposed supplier agreement that Bali did not sign, Bali says Zero Friction knew how to draft a non-compete clause against "the same or similar products" for a specific period of time[5] and had executed such agreements with other suppliers. Bali argues the purchase orders have neither the time limitation nor the prohibition against "the same or similar products" that are found in the supplier agreements.

Zero Friction accuses Bali of ignoring the only extrinsic evidence that actually addresses the meaning of the terms of purchase—the parties' testimony regarding their intent and the meaning of that agreement. According to Zero Friction, that testimony establishes that Zero Friction understood that Bali agreed through the purchase orders not to pursue sales of similar products (one-size gloves) to Zero Friction's customer, Dick's.

---

[5] The supplier agreement provided, in part:

> <u>Non-Competition</u>. During the term of this Agreement and for two (2) years after termination of this Agreement, neither Supplier, nor any affiliate, will, directly or indirectly, alone or in association with others, either as principal, agent, owner, shareholder, officer, director, partner or in any other capacity: (a) at the request of any other person or entity, manufacture the same or similar products made for [Zero Friction] using [Zero Friction's] specifications for the Products; or (b) sell the same or similar products directly to the [Zero Friction] Customers or its distrubutors [*sic*].

Dkt. # 93-1, ¶ 12.

The testimony Zero Friction points to includes Iacono's testimony that the "products" in the purchase order are one-size gloves, and testimony from Bali employee Susan Shambo acknowledging that Dick's was a customer of Zero Friction's for one-size gloves and that Dick's and Bali had discussions about producing a one-size glove while Bali was also selling the ZF gloves to Zero Friction.

Zero Friction says the purchase order's prohibition on "contact[ing], solicit[ing], sell[ing], or contract[ing] directly or indirectly" is made in reference to (and immediately following) an explicit acknowledgement of Zero Friction's proprietary interest in its business relationship with Dick's. That language, argues Zero Friction, combined with the cited testimony from Iacono and Shambo, demonstrates that Zero Friction intended the meaning of the purchase orders to encompass competing designs that were similar to the one-size ZF gloves.

In the Court's view, neither party's cited evidence is sufficient to determine the true intent of the parties, and whether there was a meeting of the minds. The record before the Court does not resolve the ambiguity in the contract's terms, and therefore summary judgment is inappropriate on Zero Friction's breach of contract claim.

Bali argues that even if the Court accepts Zero Friction's interpretation of the language in the purchase orders, the agreement is unenforceable for two reasons. First, the contract attempts to restrict use of publicly available information. And second, the contract does not limit the duration of the restriction.

16

Bali points to Iacono's testimony that Zero Friction's interpretation of the purchase orders prohibits Bali from selling *any* one-size golf gloves to Dick's regardless of whether they are similar to the ZF glove, notwithstanding the fact that there are many other unrelated one-size gloves on the market. And, the prohibition is not time-limited in any way.

Whether the contract is enforceable, however, depends on the meaning of its terms. Because there is a factual dispute as to the meaning, the Court cannot determine whether the contract is enforceable. Bali's motion for summary judgment is denied with respect to the breach of contract claim.

### D.    Tortious Interference with Prospective Economic Advantage

Bali next argues it is entitled to summary judgment on Zero Friction's tortious interference claim because Zero Friction cannot prove that it had a reasonable expectation of future business from Dick's.

To succeed on a claim of tortious interference with prospective economic advantage, a plaintiff must establish each of the following elements: (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) purposeful interference by the defendant that induced or caused a breach or termination of the expectancy; and (4) damage to the plaintiff resulting from the defendant's interference. *See Voyles v. Sandia Mortgage Corp.,* 196 Ill. 2d 288, 300–01 (2001).

It is true, as Bali points out, that "a history of filling orders for a particular customer does not, by itself, satisfy the requirement of establishing a reasonable expectancy of receiving additional orders from that customer." *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1109 (N.D. Ill. 2012); *see also Automated Concepts, Inc. v. Weaver,* 2000 WL 1134541, at *7 (N.D. Ill. 2000) ("The fact that ACI has a 'track record' of receiving work from a particular customer in the past, in and of itself, does not establish a reasonable expectation of ACI's entering into any particular future business relationship with such a customer."). Bali's evidence, however, is insufficient to permit the conclusion that no reasonable jury could find in Zero Friction's favor and that it is entitled to judgment as a matter of law.

Bali points to a series of emails between Zero Friction and Dick's to show that Dick's had become increasingly unsatisfied with its business relationship with Zero Friction. Zero Friction argues these emails are inadmissible hearsay. Bali responds that the emails are not hearsay because they are not being offered for their truth; rather Bali says "[t]rue or not, simply receiving numerous emails repeatedly complaining about the quality and profitability of the ZF gloves, could not have possibly caused [Zero Friction] to reasonably believe things looked great with Dick's and lots more orders would likely be coming." Dkt. # 112, at 17. Bali also argues at least one of the emails is not hearsay as to its truth because Zero Friction answered and addressed them on the merits, which falls under FRE 801(d)(2)(B)—the statement is offered against an opposing party and is one the party manifested that it adopted or believed to be true.

18

*See id.* (citing Dkt. # 93-6, wherein Zero Friction acknowledges sales of ZF gloves at Dick's are not strong enough). We agree with Bali as to this point.[6]

Zero Friction focuses on Iacono's testimony, arguing the evidence shows more than merely past orders; rather, it shows a growing relationship where ZF gloves were sold in increasing numbers of Dick's stores. Indeed, the record does reflect a developing business relationship—for a time. The ZF gloves started in around 100 stores which then grew to 400 stores.

The emails, however, paint a different picture—even when considering only Iacono's statements and those statements that fall under FRE 801(d)(2)(B). Iacono wrote to Dick's to explain that Zero Friction was not at fault for a duplicate carton issue. Iacono also wrote that "[i]t is challenging to be moved from 300 to 700 doors and now find the sell through was not strong enough." Dkt. # 93-6, at 2. At a minimum, the evidence reflects that it was not all smooth sailing in August of 2016, which is when Dick's told Zero Friction it would be pausing its orders for the ZF gloves. However, drawing all reasonable inferences in Zero Friction's favor and based on the present record, factual disputes preclude the entry of summary judgment in Bali's favor. Bali's motion for summary judgment is denied as to the tortious interference with prospective economic advantage claim.

---

[6] These emails would likely be admissible at trial under the business records exception, provided Bali can lay the proper foundation—which it has not done at this stage.

### E.    Unjust Enrichment

Finally, Bali argues Zero Friction's unjust enrichment claim is not "legally recognized," because the claim fully depends on and incorporates Zero Friction's breach of contract claim and explicitly states the alleged unjust enrichment was caused by Bali's alleged contractual breach.   In ruling on Bali's motion to dismiss, Judge Norgle took Zero Friction "at its word" and "accept[ed] its representation that its unjust enrichment claim is pleaded in the alternative" to its breach of contract claim.   Dkt. # 79, at 10.

Zero Friction argues that, because the Court has not yet found that a valid and enforceable contract existed between Zero Friction and Bali, it is entitled to continue to plead in the alternative.   Bali contends that there is no way Zero Friction could prevail in either scenario because, if there is a valid contract, the unjust enrichment claim would fail, and, if the contract is deemed unenforceable, it would be unenforceable as against public policy, which would preclude an unjust enrichment claim.   However, there are too many factual questions surrounding the contract and the meaning of its terms to completely foreclose any potential recovery under a theory of unjust enrichment at this time.   Bali's motion for summary judgment is denied as to Zero Friction's unjust enrichment claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Bali's Motion for Summary Judgment [92] is granted-in-part and denied-in-part as set forth above.  Status is set for 6/27/23 at 11:00 a.m.

It is so ordered.

Dated: June 2, 2023

_____
Charles P. Kocoras
United States District Judge